IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| GEORGE HELMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.  3:04-cv-480-C |
| | ) | (WO) |
| GENERAL DYNAMICS CORP., *et al*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.  INTRODUCTION**

The plaintiff, George Helms ("Helms"), brings this action against defendant General

Dynamics Corporation, General Dynamics Long Term Disability Plan, General Dynamics

Short Term Disability Plan, and Aetna Disability Services and Aetna Life Insurance

Company ("Aetna"), under the Employee Retirement Income Security Act of 1974

("ERISA"), as amended, 29 U.S.C. § 1132(a)(1)(B)[1] seeking payment of disability benefits

pursuant to an employee welfare benefit plan provided by General Dynamics and

administered by Aetna.  Specifically, Helms contends that Aetna erroneously denied him

continued benefits under his short term disability plan which effectively precluded him from

---

[1] 29 U.S.C. § 1132(a)(1)(B), which allows claimants to bring a civil action to recover benefits under an ERISA plan, provides:

(a) Persons empowered to bring a civil action.  A civil action may be brought-

(1) by a participant or beneficiary-
. . .
(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan; . . . .

receiving long-term disability benefits.  According to Helms, he meets the eligibility requirements for both short term and long term disability under the Plans.  The court has jurisdiction of this ERISA claim pursuant to 29 U.S.C. §1132(e)(1).  Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the parties have consented to the United States Magistrate Judge conducting all proceedings in this case and ordering the entry of final judgment.

Now pending before the court are cross-motions for summary judgment.  *See* Docs. # 29 & 30.  The parties have filed responses in opposition to the motions for summary judgment.  On June 20, 2005, the court heard oral argument on the motions for summary judgment.  After  careful review of the motions for summary judgment, the briefs filed in support of and in opposition to the motions, the argument of counsel and the supporting and opposing evidentiary materials, the court concludes that the plaintiff's motion for summary judgment is due to be denied and the defendants' motion for summary judgment is due to be granted.

## II. SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

2

(1986).[2]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.

The movant may meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-324.  If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-17 (11th Cir. 1993);  *see also*  FED. R. CIV. P. 56(e).  ("When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of [his] pleading, but [his] response ... must set forth specific facts

---

[2]  In *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the court stated:

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue...Rule 56(e)...requires the nonmoving party to go beyond the pleadings and by...affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate  "specific facts showing that there is a genuine issue for trial. . . .We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment...Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c) except the mere pleadings themselves. . . .

*Id.* at 324.

showing that there is a genuine issue for trial.").   What is material is determined by the substantive law applicable to the case.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).

A dispute of material fact "is 'genuine' . . .  if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the non-movant must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment.  *Anderson*, 477 U.S. at 257.  If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant.  *See  Holifield v. Reno*, 115 F.3d 1555, 1564 n. 6 (11th Cir. 1997); *Harris v. Ostrout,* 65 F.3d 912 (11th Cir. 1995).

However, if there is a conflict in the evidence, "the [plaintiff's] evidence is to be believed and all reasonable inferences must be drawn in his favor."  *Anderson*, 477 U.S. at 255; *Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351, 1356 (11th Cir. 2000).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law  FED. R. CIV. P. 56(c).  With these principles of law in mind, the court will determine now whether summary judgment is appropriate and should be granted.

### III. FACTS

Viewed in the light most favorable to the plaintiff and drawing all reasonable inferences in his favor, the following facts are treated as undisputed for the purpose of summary judgment. Helms was employed by General Dynamics as a functional analyst when, on June 27, 2003, he applied for short term disability ("STD") benefits under General Dynamics Short Term Disability Plan. (Helms Administrative Record 00108-00109).[3] Helms was scheduled to undergo surgery to repair a torn rotator cuff muscle on July 7, 2003. (HAR00109). On July 7, 2003, Claim Administrator Aetna Life Insurance Company ("Aetna") notified Helms that his claim for STD benefits was denied because Aetna had "not received medical information to show that you are disabled." (HAR00024).

On July 23, 2003, Helm's orthopaedic surgeon, D.D. Thornbury, completed and sent by facsimile to Aetna, an Attending Physician Statement. (HAR00104-00106). Helms' primary diagnosis was "torn right rotator cuff." (HAR00104). Dr. Thornbury certified that Helms was unable to return to work and his estimated date of return was unknown. (HAR00105). On the facsimile cover sheet, Dr. Thornbury indicated that Helms' next appointment was August 18, 2003. (HAR00106).

On August 15, 2003, Aetna notified Helms that his disability benefits claim was approved beginning July 8, 2003 until August 18, 2003. (HAR00025). Aetna informed

---

[3] The parties have submitted the same evidence with different designations. For simplicity's sake, wherever possible, the court will reference to the Helms Administrative Record (HAR) and corresponding Bates stamp number.

Helms that he was expected to return to work.  If he was unable "to return to work on [his] expected return to work date, it [was his] responsibility to have [his] physician call or write Aetna prior to the last date certified to extend [his] period of disability."  (*Id*.)

On August 18, 2003, Helms notified Aetna that he was being treated by a neurologist, Dr. Larry Epperson.  (HAR00119).  On August 20, 2003, Dr. Epperson sent, by facsimile, an Attending Physician Statement in which he indicated he was treating Helms for chronic headaches.  (HAR00093).  Dr. Epperson indicated that Helms could perform sedentary work activity but that he was unable to return to work.  (HAR00094).

On September 5, 2003, Aetna informed Helms that his disability benefits had been re-certified for 34 days, beginning on August 19, 2003 and continuing until September 21, 2003.  (HAR 00026).  At that time, Helms had been certified for 76 days of disability.  (*Id*.)

On September 8, 2003, Aetna informed Helms by telephone that in order for an extension of benefits beyond September 21, 2003, he would need to submit another Attending Physician Statement.  (HAR00121).  On September 11, 2003, Dr. Epperson faxed an Attending Physician Statement in which he stated that Helms was incapable of and unable to return to work.  (HAR00096-00097).  Dr. Epperson noted that Helms was "disabled – unable to return to work."  (HAR00097).  On September 22, 2003, Helms called for a status report on his claim.  (*Id*.)  At that time, Helms was informed that Aetna would  need a medical review of his file as his attending physician had now indicated that he would not be returning to work.  (HAR00121).

6

Aetna referred Helms' file to a registered nurse for review.  (HAR00122).   On September 25, 2003, the reviewing nurse, Lorna Blackmer, called Dr. Epperson's office requesting confirmation of diagnosis and treatment.  (*Id*.)  On September 26, 2003, Blackmer suggested obtaining the treatment notes from both Dr. Thornbury and Dr. Epperson. (HAR00123).  Based on a "lack of clarity" about Helms' restrictions and the cause of his impairment, Blackmer concluded that the doctors' records were necessary for a determination.  (*Id*.).  Also on September 26, 2003, Blackmer received a telephone call from Dr. Epperson's office.  According to Dr. Epperson's office, Helms was being treated for migraines and he has a history of lymphoma.   When asked for Helms' restrictions and limitations, Dr. Epperson's employee "stated the doctor wrote 'will assis (sic) [employee] with his retirement.. . . [N]o other information on [restrictions and limitations] are available." (HAR00123).

On September 30, 2003, Aetna advised Dr. Epperson's office that Aetna needed specific restrictions and limitations on Helms as well as office notes from September 21, 2003 to present.  (HAR00123).  On the same day, Aetna also advised Helms that Aetna did not have enough medical evidence and they had requested additional information from his attending physician.  (*Id*.)

On October 1, 2003, Aetna closed Helms' claim as his recovery period had expired. (HAR00124).  When Helms called on October 3, 2003, to check on the status of his claim, Aetna informed he that they had received nothing from Dr. Epperson.  On October 3, 2003,

7

Dr. Epperson faxed another Attending Physician Statement in which he stated that Helms was unable to work because he has chronic headaches. (HAR00098-00099). In the section that details "objective findings that substantiate impairment," Dr. Epperson wrote that Helms "has [headaches] every day – unable to function. Has been on numerous meds." (HAR00099).

On October 6, 2003, Helms telephoned Aetna for a status report on his claim. (HAR00124). At that time, he was advised that Aetna would be doing another medical review of his claim. Helms informed Aetna that his medications "leave him in a sedated state, can't drive, and has trouble focusing/concentrating." (*Id*.)

On October 8, 2003, nurse Holly Johnson reviewed Helms' claim. Relying on a September 3, 2003, office visit notation from Dr. Epperson, she concluded that "[t]here is not enough objective medical evidence to support continued disability." (HAR00125). Dr. Epperson's September 3, 2005, treatment note indicated that Helms

> returns for a followup for chronic headaches along with history of lymphoma. He is on Methadone 10 mg t.i.d. and he is doing remarkably well with no further headaches. He is also on Neurontin 300 mg on q.i.d., Trazodone qhs, Covera 180 qhs, and Synthroid.
>
> He is retired and trying to get Disability and I totally support him. I have tried him on numerous medications with numerous trials in the past, as well.

(HAR00095). Dr. Epperson's diagnostic impressions were

1. Chronic headaches, much improved on present regiment.
2. Adverse side effects to Paxil and Topamax.
3. Insomnia in the past, much improved.
4. History of lymphoma.

(*Id*.).  His treatment plan included

1.     Continue the above medications.
2.     He may decrease his Neurontin eventually by one every month until he gets off Neurontin.  Furthermore, he can decrease his Methadone 10 mg. b.i.d. if he would like and even take ½ at noon if needed.
3.     I support him in his endeavor to retire.
4.     Follow-up in 3-4 months.

(*Id*.).  In addition, Johnson noted that although Helms had been diagnosed with chronic headaches, no treatment was indicated.  (HAR00125).

On October 13, 2003, Aetna notified Helms that his claim for disability benefits was denied, effective September 22, 2003.  (HAR00027 & HAR00125).  According to Aetna, "Aetna cannot certify [Helms'] disability because we have not received medical evidence to show that [Helms] remains disabled."  (HAR00027).  Aetna advised Helms of his right to appeal the decision.  (*Id*.)

On October 14, 2003, Helms was advised by telephone that Aetna had received additional information from Dr. Epperson but it was insufficient to justify extending his disability certification.  (HAR00126).  Helms advised Aetna that he would forward additional clinical evidence for review.  (*Id*.)  On October 16, 2003, Dr. Epperson faxed a letter to Aetna on Helms' behalf.  (HAR00100-00101).  Dr. Epperson's letter, in its entirety, is as follows.

I write in reference to Mr. George Helms who was last seen by me on 09-03-2003.  He is a 58-yowm with a history of chronic headaches.  He also has a history of lymphoma, in remission.  I have tried him on numerous medications for headache control.  Fortunately, we have found a combination that has

9

worked, but it can cause mild sedation.

He is applying for Disability and I totally support him in that endeavor. I do not believe he can function on the present medications coupled with his chronic daily headaches.

This letter simply states that Mr. Helms is applying for Disability and I totally support him. He cannot continue to work on medication and with chronic daily headaches.

(HAR00101).

On October 21, 2003, Aetna again referred Helms' file to a nurse for review.

(HAR00126). On October 27, 2003, Blackmer completed a written review of Helms' claim.

Review of imaged medical from Dr. Epperson, neuro, Dr. Thornby, ortho. Appears [Helms] left work for repair of rotator cuff 7/8/03 which has resolved. [Helms] also has c/o of migraines. [Helms] is taking Neurontin and Methadone for said H/As. Per 9/03 narrative, Dr. Epperson [Helms] is greatly improved; is taking Neurontin monthly and may cut down to ½ tablet of Methadone (½ of 10 mg.). Of note, appears [Helms] worked with [symptoms] of H/A and [treatment] with above medication propor to LDW – [Helms] apparently was working with [diagnosis] of H/As – thus am unclear as to what has changed beyond Rotator cuff repair., (sic) thus medical does not support ongoing R&Ls. Please note Dr. Epperson's narrative states [Helms] is retired and he supports [Helms'] decision to obtain disability. [Helms'] condition is improved so that his medication is being decreased and eliminated, so if [Helms] worked with more medication, reasonable [Helms] could work now that [symptoms] are so much better and medication is increased.

(HAR00127).

On October 30, 2003, Aetna sent Helms a denial of certification letter. (HAR00029).

Specifically, Aetna informed Helms that it could not certify that he remained disabled

because it had not received medical information supporting his claim. (*Id*.) In addition,

10

Aetna notified Helms by telephone that his claim was being denied based on Dr. Epperson's

note that his medication dosages were being lowered.  (HAR00128).  Finally, Aetna faxed

a notification to Dr. Epperson's office that Helms's claim for disability beyond September

22, 2003, was not supported by the medical record, and  requested office visit notes from

April 2003 to present, and the results of any objective medical tests.  (*Id.*)

> We have received a disability claim for the above named patient.  At this time
> the medical information that we have received does not support his impairment
> past September 22, 2003.  In order for Mr. Helms to continue his disability
> benefits, we will need the office visit notes from April 2003 to present.  Along
> with these notes we will also need detailed restrictions and limitations.  Also,
> we will need the results of any MRI's, X-rays, or other tests results, that Mr.
> Helms may have had.

(HAR00102).

On November 11, 2003, Dr. Epperson provided Aetna with his office notes

documenting his treatment of Helms.  (HAR00128-129).  Dr. Epperson first saw Helms on

February 27, 2003, because Helms was complaining of headaches on a daily basis "for the

past several months."  (HAR00085).  At the time, Helms was on Trazodone, Skelaxin,

Amoxicillin, Hydrocodone, Pravachol, Zantac, Flomax, and Synthroid.  (*Id.*)  Because

Helms' headaches were "very worrisome." Dr. Epperson ordered an MRI brain scan.

(HAR00086).  Helms was also continued on Lorcet Plus.  (*Id.*)  On March 11, 2003, Helms

returned for a follow-up visit to Dr. Epperson.  (HAR00087).  At that time, Helms

complained that his headaches had been "constant."  (*Id.*)  Helms advised Dr. Epperson that

Lorcet Plus was "too strong," Midrin was "ineffective," and stopping his Flomax had not

altered his headaches.  (*Id*.)  The MRI brain scan was "totally normal."  (*Id*.)  Dr. Epperson

suggested that perhaps Helms had "some jaw claudication,"[4] but referred him for a MRI scan

of his cervical spine.  (*Id*.)  On March 31, 2003, Helms complained to Dr. Epperson that he

had been experiencing chronic headaches since February.  (HAR00088).  The MRI of his

cervical spine "showed disc protrusion at midline at C6-C7. . . [and] slight chronic appearing

compression fracture at the endplate of T2."[5]  (*Id*.)  Dr. Epperson discontinued the Neurontin

and Ultracet.  (*Id*.)  In addition, Helms was started on Paxil and taken off Trazodone.  (*Id*.).

On April 15, 2003, Helms complained to Dr. Epperson of chronic daily headaches that "start

in the back of the head and the top of the head."  (HAR00089).  Helms was referred for a

lumbar puncture to check from recurring lymphoma, meningitis or other infection.  (*Id*.)

In April 2003, Helms underwent a lumbar puncture to "[r]ule out cephaloneuralgia."

(HAR00090).  The hospital noted indicated that Helms' MRI of the brain and cervical spine

were "grossly normal."  (*Id*).  Although Helms endured a severe spinal headache as the result

of the lumbar puncture that was treated with a blood patch, the lumbar puncture revealed no

abnormalities.  (HAR00090-91).  On May 8, 2003, Dr. Epperson noted that Helms'

headaches were "somewhat improved on Topamax; but he feels horrible.  He states that he

feels just washed-out and fatigued, and has difficulty doing his job at work."  (HAR00091).

---

[4]  Jaw claudication is a symptom of temporal arthritis and involves pain in the jaw or tongue.
http://www.vh.org/adult/patient/internalmedicine/aba30/2002/temporalarteritis.html.  As a result, "severe
throbbing headaches can occur in both temples."  (*Id*.)

[5]  The bulge at C6-C7 was described as a "small focal disc bulge."  (HAR00089).

12

Dr. Epperson opined that Helms' fatigue and difficulty concentrating were probably "secondary to Topamax." (*Id*.) Dr. Epperson reiterated that Helms' cervical spine MRI "showed minimal degenerative changes." (*Id*.) Dr. Epperson began to taper Helms off Topamax "fairly rapidly," and started him on Neurontin. (*Id*) Dr. Epperson also suggested considering short term and possibly long term disability. (*Id*.) On June 2, 2003, Helms reported feeling better because he was off Paxil and Topamax. Although Helms expressed concern about working with his headaches and drowsiness from his medications, Dr. Epperson noted that Helms' headaches were "much improved." (*Id*.). Dr. Epperson did not provide Aetna with copies of the results of Helm's MRI's.

On November 13, 2003, Blackmer completed her review of Dr. Epperson's records and concluded that the medical records did not support continued disability. (HAR00129). On November 19, 2003, Aetna informed Helms by letter that his claim for continued certification of disability was denied. (HAR00031). Helms was advised of his right to appeal Aetna's decision. (HAR00032). On November 20, 2003, Aetna verbally informed Helms' of his right to appeal the denial decision. (HAR00130).

On November 25, 2003, Helms wrote to Aetna urging them to approve his application for disability benefits.[6] (HAR00034). Helms advised Aetna that his medications prevented him from working because he could not concentrate or drive and that he had to "lie down several times a day." (*Id*.) Although his medications reduce the severity of his headaches,

---

[6] Aetna treated this letter as an appeal of the denial of benefits. (HAR00034).

Helms asserted that he had not decreased his dosages as recommended by Dr. Epperson because the headaches returned in severity and intensity. (*Id.*) Helms also submitted his "Daily Activities Questionnaire" that he submitted to the Social Security Administration in support of his application for Social Security Disability benefits. (HAR00035-0039). In this questionnaire, Helms described his daily activities as "walk the dog, nap, light cleaning [and] watch some TV." (HAR00035). He also loads the dishwasher, does the laundry and dusts. (HAR00036). Although he stated that he naps two to three time a day, he sleeps better at night. (HAR00035). He is able to care for his personal needs, he can cook and prepare food,[7] and he shops weekly for his personal needs. (HAR00036). Helms stated that his wife vacuums because of "pain and weakness in my arm and shoulder." (*Id.*) He stated that he cannot drive, he is unable to concentrate on complicated tasks, and he tires easily. (HAR00037-38). He stated that his "biggest problem is driving – tiring easily." (HAR00037). Finally, Dr. Epperson also wrote a letter in support of Helms' claim for disability.

> This letter is in support of the appeal of Mr. Helms' disability claim.
>
> I strongly urge you to approve Mr. Helms' application for disability benefits.
>
> Mr. Helms suffers from daily chronic headaches of a debilitating nature. He is presently taking medication to control the severity of the headache episodes. These medications, neurontin and methadone, cause sedation interfering with his ability to work or drive a vehicle and numerous other daily activities.
>
> Mr. Helms is unable to work while taking the medications required for his

---

[7] Helms stated that he does not cook food requiring recipes or several ingredients. (HAR00036)

condition.  He must have the medication to control the pain.  Mr. Helms was seen by me in my office this date, his condition remains the same and he must continue his medication regime in order to control the pain.

I sincerely hope you will find in his favor.

(HAR00103).

On December 4, 2003, Aetna advised Helms that his appeal was received and a review of his claim had begun.  (HAR00040).  Helms was also advised to submit any additional medical information in support of his claim.  (*Id.*).

On January 16, 2004, Aetna exercised its right to extend the deadline for reviewing his appeal.  (HAR00041).  On February 19, 2004, Helms' attorney contacted Aetna requesting "an explanation of the scientific or clinical judgment for the determination, applying terms of the plan to [Mr. Helms'] medical condition."  (HAR00042).

On February 26, 2004, Aetna denied Helms' appeal of the decision to terminate his short term disability benefits.  Aetna detailed the procedural history of Helms' claim and then set forth the reasons for its decision.

This [Disability Determination Daily Activities] questionnaire provides insight in to the activities Mr. Helms may be able to do or not do within the course of a day.  It does not address any type of job related functions.  It does not inquire about restrictions and or limitations, which prevent Mr. Helms from returning to his position as a systems analyst.

The narrative note received from Dr. Epperson, M.D., dated October 14, 2003, gives a brief history of Mr. Helms' medical conditions, which include a history of chronic headaches, and lymphoma, in remission.  He describes the treatment he has previously used for headache control and then states that a combination of medications has finally resulted in successful symptom relief.  However, it may cause mild sedation.  Dr. Epperson continues, stating that Mr. Helms is

15

applying for disability and he believes that medication, coupled with chronic headache is preventing him from returning to work.

With this note, Dr. Epperson has provided a brief medical history of Mr. Helms. He also renders an opinion regarding Mr. Helms' abilities to return to the workplace. He has provided statements but gives no rationale for these statements. This note does not provide medical information to substantiate a total disability from work as a systems analyst.

An additional narrative note received from Dr. Epperson, M.D., dated November 25, 2003, states that he, (Dr. Epperson) is in support of Mr. Helms appeal and urges appeal reviewer to approve Mr. Helms. He continues with a brief description of Mr. Helms' medical condition stating that he is unable to work due to sedation caused by medication.

This note provides no new information to support restrictions and limitations from work. This is information that was used during the initial decision making process.

Mr. Helms' last day of work prior to the onset of his disability was July 7, 2003. At that time he was requesting temporary disability income benefits for recovery time following surgery to repair a torn rotator cuff. As the time he submitted his claim, he was asked if he had any other medical conditions. He stated that he was being treated for high blood pressure, an enlarged prostate, and thyroid problems. He did not mention his recurrent headaches.

An office visit note submitted by Dr. Epperson detailing a visit on March 31, 2003 states that Mr. Helms underwent both an MRI of the brain and cervical spine, both of which were completely normal. Physical exam was normal as well.

A review of Mr. Helms' complete claim file indicates that he was out of work from April 20, 2003 through May 2, 2003 for recovery from a lumbar puncture. No mention of recurrent, severe headaches was made other than the reason for the procedure to which he replied "pain."

Mr. Helms began complaining of severe headaches in February 2003. He worked, full time while taking multiple medications, which included a narcotic, Hydrocodone. Dr. Epperson has stated that Mr. Helms experiences sedation from his medication, which is why he cannot work. The medication

Mr. Helms was taking at the onset of disability was reported by Mr. Helms to be Synthroid, Flomax, and Covera. There is no mention of a sedating, narcotic medication. Medication he has been taking while out of work is Methadone and Neurontin. If Mr. Helms was not on this medication regime at the onset of disability in July 2003, and has not worked since this medication was prescribed he cannot adequately be evaluated with respect to restrictions and limitations in the workplace.

. . .

We fully recognize the medical conditions and symptoms Mr. Helms does suffer from and they can be quite uncomfortable, however, the presence of a symptom(s), diagnosis, and condition alone is not sufficient to qualify for disability benefits based on General Dynamics Corp. Plan. . . .

(HAR00044-45).

The plaintiff filed this lawsuit on May 18, 2004, seeking payment of disability benefits. (Doc. # 1).

## IV. DISCUSSION

**A.    Breach of Fiduciary Duties Claims**.  As an initial matter, the court quickly disposes of Helms' claims regarding General Dynamics' breach its fiduciary duty to administer the Plan in a fair and impartial manner and Aetna's breach of its fiduciary duty to perform a full and fair review of his claim during the appeal process.  Both the plaintiff and the defendants argue that they are entitled to summary judgment on these breach of fiduciary duty claims.  The law is clear that Helms cannot alternatively plead a Section 502(a)(3)[8] breach of fiduciary duty claims if he has an adequate remedy under Section

---

[8]  Section 502(a)(3), codified at 29 U.S.C. § 1132(a)(3) provides, that "[a] civil action may be brought . . . by a participant,  beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan; . . ."

502(a)(1)(B).[9]  "[A]n ERISA plaintiff with an 'adequate remedy' under Section 502(a)(1)(B) could not alternatively plead and proceed under Section 502(a)(3)."  *Jones v. Am. Gen. Life & Accident Ins. Co.*, 370 F.3d 1065, 1072-73 (11th Cir. 2004); *Katz v. Comprehensive Plan of Group Ins., Alltel*, 197 F.3d 1084, 1088 (11th Cir. 1999).  In *Varity  Corp. v. Howe*, the Court allowed the plaintiffs to proceed under the "catch-all" provision encompassed within section 502(a)(3) because the plaintiffs did not otherwise have an adequate remedy under ERISA. 516 U.S. 489, 512 (1996).  Because the plaintiffs in *Varity* could not proceed under section 502(a)(1) for the wrongful denial of benefits or information, or section 502(a)(2) which related to fiduciary duties related to the Plan's financial integrity,[10] the Court allowed the plaintiffs to proceed under the "catch all" section 502(a)(3).  *Varity Corp.*, 516 U.S. at 515.  Such is not the case here.  The plaintiff has stated a cause of action and has an appropriate remedy, if he is successful, under 502(a)(1)(B).  Consequently, the plaintiff cannot pursue an alternative theory of wrongful denial of benefits under section 502(a)(1)(B) and   claims   for   breach   of   fiduciary   duties   under   section   502(a)(3)   based   on   the   same

---

[9]  Section 502(a)(1)(B), codified at 29 U.S.C. § 1132(a)(1)(B) provides, in pertinent part:

A civil action may be brought –

(1) by a participant or beneficiary –
. . .
(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan; . . .

[10]  Section 502(a)(2) permits recovery by the Plan, not an individual beneficiary.  *See Varity Corp v. Howe*, 516 U.S. 489, 515 (1989).

allegations.  The plaintiff's claims of breach of fiduciary duties are due to be dismissed.
Accordingly, the court concludes that the plaintiff's claims under section 502(a)(3) cannot
proceed, the defendants' motion for summary judgment on these claims is due to be granted,
and the plaintiff's motion for summary judgment on these claims is due to be denied.

**B. Denial of Short-Term Disability Benefits Claim**.  The parties agree that the civil
enforcement provisions of ERISA, 29 U.S.C. § 1132(a), provide the exclusive remedy
available to recover benefits due under employee benefit plans.  *Pilot Life Ins. Co. v.
Dedeaux,* 481 U.S. 41 (1987).  The parties strongly disagree about what standard of review
the court should apply to evaluate Aetna's decision to deny Helms' benefits.  In his brief,
Helms argues that because General Dynamics retains control to review and modify Aetna's
decisions regarding disability determinations and General Dynamics pays short-term
disability benefits out of its assets, General Dynamics was operating under a conflict of
interest so that the 'heightened' arbitrary and capricious standard should apply in this case.
During oral argument, Helms argued that Aetna operated under a conflict of interest because,
although it was only administering the short-term disability plan, Aetna funds the long-term
disability plan.  Helms argues that because he had to exhaust his short-term disability benefits
before he could apply for long-term disability benefits, it was in Aetna's best interests as
administrator to terminate Helms short-term disability benefits so he would be ineligible for
long-term disability benefits which Aetna funded.  Not surprisingly, the defendants argue that
neither General Dynamics nor Aetna was operating under a conflict of interest so that the

'arbitrary and capricious' standard of review applies.

The court pretermits a lengthy discussion about the appropriate standard because, as the Eleventh Circuit aptly noted, "the distinctions between the heightened arbitrary and capricious, arbitrary and capricious, and *de novo* standards of review have become difficult to discern over time." *Williams v. Bellsouth Telecommunications, Inc*., 373 F.3d 1132, 1137 (11th Cir. 2004).  Consequently, in an effort to clarify the appropriate analytical framework, the Eleventh Circuit has delineated the appropriate approach "for use in judicially reviewing virtually *all* ERISA-plan benefit denials."  *Id*. (emphasis in original).

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is "*de novo* wrong" and he *was* vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
> (5) If there is no conflict of interest, then end the inquiry and affirm the decision.
> (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams*, 373 F.3d at 1137-38.  *See also Langford v. UNUM Life Ins. Co. of Am., TRW*, 2005 WL 1349567 (11th Cir. June 8, 2005).

Following the framework set forth in *Williams*, the court concludes that, under the *de*

20

*novo* standard of review, Aetna's determination that Helms was not disabled under the terms of the Plan was not 'wrong'.  "Under the *de novo* standard, we have described "'[w]rong' [a]s the label used by our precedent to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claims administrator's plan interpretation." *Langford*, at *2.  A *de novo* standard of review does not restrict the court to information available to the plan administrator at the time of its determination.  Instead, the court may consider any information that is relevant to the denial of benefits.  *See e.g., Moon v. Home Assur. Co.*, 888 F.2d 86, 89 (11th Cir. 1989; *Kirwan v. Marriott Corp.*, 10 F.3d 784, 789 (11th Cir. 1994).

Helms argues that he is entitled to summary judgment because the defendants failed to present any reliable medical evidence to contradict his treating physician's opinion that he is totally disabled and unable to work.  Specifically, he argues that Aetna's decision to deny benefits was wrong because the "[d]efendants arbitrarily ignore the majority of the evidence submitted by plaintiff and his treating physicians in support of his claims for disability benefits."[11]  (Pl's Res. in Opp. to Defs' Mot. for Summ. J., at 3).  The defendants, on the other hand, argue that its decision to deny Helms short-term disability benefits was neither arbitrary nor capricious because the medical evidence was insufficient to demonstrate that Helms was disabled under the terms of the Plan.  Specifically, the defendants assert that

---

[11]  Helms references *Williams*, *supra*, he does not follow the analytical framework established by *Williams*.  Consequently, although Helms refers to the defendants' decisions as "arbitrary and capricious,"the court will utilize the terminology found in *Williams*, 373 F.3d at 1138.

Helms failed to present objective medical evidence demonstrating that he is disabled, and that all the objective medical evidence was negative or normal.  Furthermore, they argue that Dr. Epperson's opinion is not entitled to any deference because his narrative notes do not support his conclusions and he failed to submit sufficient medical evidence to support his opinions.

Under the terms of the Plan, Helms is considered disabled "if, as a result of a disabling health condition, [he is] continuously unable to perform the essential duties of [his] regular occupation in substantially the same manner as [he] did just before incurring a medically determined physical or mental impairment."  (General Dynamics Corp., Short-Term Disability (STD) Plan, at p. 2).  The undisputed evidence demonstrates that Helms initially applied for short-term disability benefits because he was scheduled to undergo shoulder surgery to repair his right torn rotator cuff on July 8, 2003.  (HAR00116).  When Helms applied for short-term disability, he listed other medical conditions including high blood pressure, enlarged prostate, and thyroid.  He did not list chronic headaches as a medical condition.  (*Id.*)  Helms did not inform Aetna that he was being treated by a neurologist for headaches until August 18, 2003, after he had been approved for short-term disability benefits due to his shoulder surgery.  (HAR00093).  At that time, Dr. Epperson completed an Attending Physician's Statement in which he indicated that Helms could perform sedentary work but that he was unable to return to work at that time.  (HAR00094).  Dr. Epperson provided no medical records, office visit notes or other medical evidence to support

his conclusion that Helms was presently unable to work due to chronic headaches.  Dr. Epperson saw Helms on September 3, 2003 and noted at that time, that Helms "is on Methadone . . . and he is doing remarkably well with **no further headaches**." (HAR00125) (emphasis added).  In addition, Dr. Epperson's diagnostic impression was that Helms' chronic headaches were "much improved on present regiment." (*Id*.)  Dr. Epperson suggested a follow-up appointment in three to four months. (*Id*.)  Nonetheless, on September 11, 2003, Dr. Epperson completed another Attending Physician Statement in which he opined that Helms was disabled and unable to return to work. (HAR00097).  Neither Dr. Epperson nor Helms submitted any objective medical evidence to support Dr. Epperson's conclusion that Helms was disabled even though his headaches were apparently controlled with medication.

Despite repeated requests, Dr. Epperson's office did not furnish Aetna with additional information regarding Helms' restrictions and limitations.  However, Dr. Epperson did submit two additional letters to Aetna in which he discusses Helms' headaches. (HAR00101).  In the first letter, dated October 16, 2003, Dr. Epperson describes treating Helms with numerous medications, and "[f]ortunately, we have found a combination that has worked, but it can cause mild sedation." (*Id*.)  Dr. Epperson then states, with no further explanation, that Helms "cannot continue to work on medication and with chronic headaches." (*Id*.)  In the second letter, dated November 25, 2003, Dr. Epperson describes Helms' headaches as "debilitating" and concludes that his medications "cause sedation

23

interfering with his ability to work or drive and numerous other daily activities."
(HAR00103).

Aetna rejected Dr. Epperson's conclusory opinions because they are not supported by
the medical evidence, including his own office visit notes.[12]  Dr. Epperson's office visit notes
detail Helms' treatment.  He was first seen on February 27, 2003, complaining of headaches.
(HAR00085).  Helms was seen on March 11, 2003 and March 31, 2003, complaining of
headaches but MRI scans of his brain and spine were "grossly normal."[13]  (HAR00090). A
lumbar puncture revealed no abnormalities.  (HAR00090-91).  It was not until May 8, 2003,
that Helms complained that he was having difficulty working.  (HAR00091).  At that time,
Dr. Epperson opined that Helms' fatigue and difficulty concentrating was the result of his
medication, Topamax, so he rapidly tapered Helms off the medication.  (*Id*.)  In fact, at his
next visit, Helms reported feeling better because he was off Topamax and Paxil.  (*Id.*)
Although Helms still complained about his headaches, Dr. Epperson noted that the headaches
were "much improved."  (*Id*.)

Dr. Epperson's treatment plan was geared towards developing a medication regime
that would effectively treat Helms' headaches.  As evidenced by his treatment notes, Dr.

---

[12]  The fact that Aetna had its own employee review Helms' medical evidence including Dr.
Epperson's notes does not warrant a finding in Helms' favor.  As a matter of law, Aetna could utilize its own
employee to make a medical determination. *See Newell v. Prudential Ins. Co. of Am.*, 904 F.2d 644, 650 (11th
Cir. 1990).

[13]  Although the MRI scan of Helms' cervical spine on March 19, 2003, revealed "small focal disc
bulge on the right and right of the midline at C6-C7 with chronic appearing compression of the superior
endplate at T2," Dr. Epperson reported that the spine MRI was "grossly normal."  *See* HAR00089-90.

Epperson was successful.  His last treatment note clearly states that Helms is "doing remarkably well with no further headaches."  (HAR00095).  In addition, there is no indication in this note that Helms was complaining of drowsiness or other side effects from his medication.  (*Id*.).  All medical tests were normal.

To the extent that Helms argues that he is entitled to summary judgment because the defendants failed to present any reliable evidence to contradict his treating physician's opinion that he is disabled, he is entitled to no relief.  In *Black & Decker Disability Plan v. Nord*, the Supreme Court specifically held that in ERISA cases, "plan administrators are not obligated to accord special deference to the opinions of treating physicians."  538 U.S. 822, 825 (2003).

> Plan administrators, or course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. But, we hold, courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

*Id*. at 834.

Aetna considered the opinions of Dr. Epperson but declined to credit his opinions because he gave "no rationale for [his] statements," and he failed to give any information on Helms' restrictions and limitations, other than to conclude he was disabled, despite repeated requests from Aetna for additional information.  (HAR00044). Aetna also relied on Dr. Epperson's office visit notes that Helms was doing well, and his medication regime was working to treat his headaches.  Finally, Aetna considered that Helms had worked prior to

his shoulder surgery, even while on medication, and that when he applied for short-term disability benefits, Helms had not listed chronic headaches as an impairment. Under the facts of this case, neither Aetna's decision that Helms had not presented sufficient evidence that he was disabled nor its decision not to credit Dr. Epperson's opinion that Helms was disabled from headaches or the side effects of his medications was wrong.

Relying on *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321 (11th Cir. 2001), which he asserts is a factually identical case, Helms argues that he is entitled to summary judgment and an award of benefits. However, *Levinson* is factually distinguishable because in *Levinson*, the plaintiff had satisfied his obligations under the terms of the plan to demonstrate that he was disabled. Thereafter, the court held that the defendant had to produce evidence showing that Levinson was no longer disabled in order to terminate his benefits. *Levinson*, 245 F.3d at 1331. In this case, Aetna does not have to disprove that Helms is disabled because Helms did not first meet his burden of establishing that he meets the definition of disability in the Plan.

Because the court concludes, after a *de novo* review of the evidence, that Aetna's decision that to deny Helms short-term disability benefits was not wrong, the court need not determine whether Aetna's decision was tainted by a conflict of interest.

> It is important to note that where the district court agrees with the ultimate decision of the administrator, it will not decide whether a conflict exists. It is only when the court disagrees with the decision that it looks for a conflict, and when one is found, reconsiders the decision in light of this conflict.

*Yochum v. Barnett Banks, Inc. Severance Pay Plan*, 234 F.3d 541, 544 (11th Cir. 2000). *See*

*also Williams, supra*; *HCA Health Servs. of Ga, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 993-94 (11th Cir. 2001). Consequently, the court concludes that the defendants' motion for summary judgment on the plaintiff's claim that he was wrongly denied short-term disability benefits is due to be granted and the plaintiff's motion for summary judgment on this claim is due to be denied.

**C. Denial of Long-Term Disability benefits Claim.** In his motion for summary judgment, the plaintiff argues that he was wrongly denied long-term disability benefits under the Plan. The defendants respond that Helms is not entitled to long-term disability benefits because he was neither qualified for nor did he apply for long-term disability benefits under the Plan. In opposition to the defendants' motion for summary judgment, Helms appears to concede that he did not apply for long-term disability benefits but argues that it would have been futile to apply since Aetna had already denied him short-term disability benefits.

The undisputed evidence demonstrates that Helms never applied for long-term disability benefits under the Plan. Although Helms argues that it would have been futile to apply for long-term disability benefits because he had not completed 26 weeks of short-term disability, the LTD Plan did not require that Helms exhaust his short-term disability benefits before he became eligible for long-term disability benefits. The LTD Plan clearly contains an elimination period which is defined as "the *later of* 26 weeks *or* the end of your short-term disability benefits." (General Dynamics Corp. Long-Term Disability (LTD) Plan at 3, HAR00066) (emphasis in original). While "[t]he LTD Plan is designed to begin when the

27

STD benefits end," nothing in either the LTD or STD Plans requires STD exhaustion before being eligible for LTD.  *See* General Dynamics Corp Short-Term Disability Plan at 6, HAR00009 and General Dynamics Corp. Long-Term Disability (LTD) Plan at 3, HAR00066. Consequently, because Helms never applied for LTD benefits, it is purely speculative that Aetna would have denied his claim.  Moreover, because Aetna never denied Helms long-term disability benefits due to the fact that he never applied, at this juncture, there is no adverse decision for the court to review.  Accordingly, the defendants' motion for summary judgment on the plaintiff's long-term disability claim is due to be granted and the plaintiff's motion for summary judgment on this claim is due to be denied.

## V.  CONCLUSION

Accordingly, for the reasons as stated, it is

ORDERED that the defendants' motion for summary judgment (doc. # 29) be and is hereby GRANTED and the plaintiff's motion for summary judgment (doc. # 30) be and is hereby DENIED.

An appropriate judgment will be entered.

Done this 1st day of November, 2005.


        /s/Charles S. Coody
CHARLES S. COODY
CHIEF UNITED STATES MAGISTRATE JUDGE